Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**SERGIO A. LOPEZ**
Indiana Department of Child Services
Elkhart, Indiaan

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF PARENT-CHILD RELATIONSHIP OF R.E. (Minor Child), | ) ) ) ) | |
| and | ) ) | |
| D.E. (Father), | ) ) | |
| Appellant-Respondent, | ) ) | No.  20A05-1209-JT-469 |
| vs. | ) ) ) | |
| THE  INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Magistrate
Cause No. 20C01-1203-JT-8

**July 9, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

D.E. ("Father") appeals the involuntary termination of his parental rights to his child, R.E. ("Son"). Father raises the following restated issues: (1) whether there is sufficient evidence supporting the trial court's judgment terminating Father's parental rights; (2) whether termination of Father's parental rights are in the best interests of Son; (3) whether there is a satisfactory plan for the care and treatment of Son.

We affirm.

### Facts and Procedural History

The facts most favorable to the juvenile court's judgment reveal that on March 15, 2010 the Elkhart County Department of Child Services ("ECDCS") received a report regarding Son. On the evening of March 12, 2010, Father arrived, inebriated, at his sister's ("Aunt's") home where Father and Son were also living. Aunt, Son and his four cousins were present when Father arrived. Aunt locked the door to keep Father out. Father kicked down the door and forced his way into the home to get Son. Cousin One, seventeen years old, tried to stop Father from taking Son. Father began hitting Cousin One. During this time, Father struck Son in the eye. Father only stopped hitting Cousin One when Cousin Two hit Father in the back of the head with a hammer. At the time of the incident, Son was ten years old.

Prior to this incident, between 2007 and 2010, Father and Son lived together in Alaska. Son lived with K.H. ("Mother") in Alaska for most of his early life. Father did not meet Son until he was five years old. Tr. p. 371. Son was brutally abused by Mother and Grandmother. He was placed in a psychiatric hospital at age five, and diagnosed

2

with Post Traumatic Stress Disorder ("PTSD"). Tr. pp. 225 and 369. Father was contacted about Son for the first time in 2005. At the time, Father was living in North Carolina. Tr. p. 370, but he immediately left for Alaska. After waging a legal battle for two years, he finally won custody of Son, and they lived together in Anchorage until 2010. After being the victims of a burglary, Father determined Anchorage was no longer safe for Son. Father and Son moved into Aunt's home in Goshen, Indiana.

When Father and Son returned to Elkhart County to live with Aunt, Father knew that he had an outstanding warrant for probation violation in nearby Kosciusko county. Tr. p. 373. Father gave Aunt money to care for Son and turned himself in to answer for the underlying probation violation. The March 12 incident at issue occurred approximately three weeks after Father and Son moved in with Aunt, and sadly, it was not the only incident. Within the two week period following the March 12 incident, Father and Aunt's mother, who was still living in Alaska at that time, called law enforcement officers to Aunt's home five different times. Aunt's landlord sought to meet with her to discuss both the March 12 incident and the repeated law enforcement interventions that followed. Because Aunt could not jeopardize her living arrangements with her own children, she could not keep Son.

On March 23, 2010, ECDCS filed a request for an emergency order to remove Son from the home. The order was granted, and Son was placed in therapeutic foster care. Larry Mast, a Court Appointed Special Advocate ("CASA"), was appointed on March 25, 2010. Father's public defender, Michelle McCuen, ("PD") filed an appearance on March 26, 2010. Father was incarcerated at the time of the April 1, 2010 initial hearing, but he appeared at the hearing with counsel. After Father entered a qualified admission

3

of the allegations, the juvenile court adjudicated Son as a Child in Need of Services ("CHINS") and set a disposition hearing for April 29, 2010.

Prior to the disposition hearing, Dr. Joseph Cresci of Benchmark Family Services met with Son for a psychiatric evaluation. Dr. Cresci diagnosed Son with Relational Attachment Disorder ("RAD"), Post-Traumatic Stress Disorder ("PTSD"), and Mood Disorder with Psychosis. Appellant's App. p. 51.

Father appeared with counsel at the April 29, 2010 dispositional hearing. The court accepted ECDCS's Predispositional Report recommendations. The court ordered Father to:

- Participate in AA meetings
- Participate in drug/alcohol assessment
- Participate in parenting classes
- Participate in GED classes
- Correspond with Son at the discretion of Son's therapist

Appellant's App. p. 62. The Six-Month Periodic Case Review Hearing was set for September 16, 2010.

ECDCS submitted a progress report on July 26, 2010. The progress report indicated that Father was participating in an alcohol and drug assessment. Father was incarcerated, so he could not visit with Son. However, Father did send letters to Son.

ECDCS submitted a second progress report on September 2, 2010 indicating that Father was participating in AA/NA classes and parenting classes while incarcerated. Father wrote frequent letters to Cindi Schnitz, later Cindi Callan, the Family Case Manager, ("Family Case Manager"). His letters provided updates about both his class participation and his legal issues. Appellant's App. p. 76.

4

Father appeared with counsel at the September 16, 2010 periodic case review hearing. The court noted that Father had thus far complied with the child's case plan and had enhanced his ability to fulfill his parental obligations. The court ordered Son to remain in therapeutic foster care. The court set the Permanency Hearing for March 10, 2011.

Between September 2010 and February 2011, Father was released from jail, and he began having supervised visitation with Son. Before and after these visitations, Son's behavior deteriorated significantly. Son struggled with his behavior at home, at school, and during after-school care. Son punched himself in the face, pulled his own hair, called himself "stupid," and acted physically aggressive toward others. Appellant's App. p. 85. Son also disclosed that he had been physically abused by Father in the past. On February 7, 2011, ECDCS submitted a motion to modify the dispositional decree requesting that all contact between Father and Son be suspended until Son stabilized and that Father undergo a "psycho-parenting" assessment. On February 17, 2011, the court entered a modification order to the dispositional decree ordering Father to:

- Complete a "Psycho-Parenting" Assessment and follow the recommendations
- Suspend visitation until the therapist recommends that they resume
- Pay $20 a week in child support
- Participate in individual therapy
- Notify ECDCS of arrest or criminal charges
- Sign a release of information

Appellant's App. p. 88.

The February 28, 2011 ECDCS Permanency Progress Report noted that Son was, "a little behind his peers socially, emotionally and educationally." Appellant's App. p.

Son was further diagnosed with Attention Deficit Hyperactive Disorder ("ADHD"), Anxiety, and enuresis.[1] The report noted that Father was working to maintain a home and had participated in supervised visitation until it was suspended by the court. Father missed only one visitation, due to a transportation issue. Father planned on participating in individual therapy and family therapy. Father participated in Child and Family Team Meetings. The report indicated that reunification was still the objective.

On March 10, 2011, Father appeared with counsel at the permanency and review hearing. The court found Father to be compliant with the case plan. Appellant's App. p. 96. The court approved a permanency plan of reunification. A Review Hearing was set for September 1, 2011.

On June 22, 2011, Father requested a hearing to address visitation, and he attended the hearing with counsel on June 30, 2011.[2] On July 1, 2011, the court entered a modification order finding that although Father was in compliance with services, Son was still fragile. Even mentioning Father to Son, "is adverse to the child [Son] at this time and caution is demanded." Appellant's App. p. 100. An Interim Review Hearing was scheduled for August 4, 2011.

Father appeared with counsel at the August 4, 2011 Interim Review Hearing. The court found that Father was engaged in treatment, but ordered a continuation of orders and a release of information so Son's therapist and Father's therapist could communicate. The August 16, 2011, the ECDCS progress report revealed that Son's behavior was

---

[1] Also known as uncontrolled urination.
[2] During this hearing the magistrate said on record, "if a petition to terminate parental rights is filed, I can set it out for six months, I don't have to set it tomorrow, so, it doesn't mean it's the end of the-the road. It simply means they're going through the motions and I can go through the motions too." Tr. pp 103-04. However, the record did not reflect that ECDCS filed a termination petition during the summer of 2011.

showing some improvement. He was attending therapy once a week, and both Father and Son were working independently toward family therapy with their individual therapists. Appellant's App. p. 104. The report further noted that Father participated in a drug and alcohol assessment and individual therapy. He had maintained a home since his incarceration ended and been in contact with the Family Case Manager. Father also reported participating in AA meetings.

Father and counsel attended the September 1, 2011 Review Hearing. The court order found that Father had complied with Son's case plan, however, therapeutic foster care was still the best placement for Son. The court ordered another Permanency Hearing on February 23, 2012. Due to scheduling conflicts, the court changed this date to February 16, 2012.

On February 1, 2012, ECDCS filed a Permanency Progress Report finding that Son still suffered from PTSD, ADHD, anxiety, depression, and enuresis. Son had verbal temper tantrums on a weekly basis, and he spat on and scared his foster siblings. Son felt safe in his current placement but kept changing his mind about wanting to live with Father. The report noted that Father "sporadically" participated in individual and family therapy, attending only eight out of a possible twenty-two individual family therapy sessions. Appellant's App. p. 117. Father attended five out of a possible twenty Batterer's Intervention Program Group meetings. Father attended four family therapy sessions between November 18, 2011 and February 1, 2012. Father cancelled two sessions due to work and a sprained ankle, and the foster parents cancelled one due to a

faulty vehicle. Father owed $980 in child support. During this time, Father relocated to Bourbon, Indiana with his girlfriend.[3]

Father appeared with counsel at the hearing on February 16, 2012. At that hearing, the Case Manager disclosed that ECDCS had modified the plan to call for termination of parental rights. When Father was asked about this change during the hearing, he said that he did not agree with the change and that he would fight it. The court approved the permanency plan and set the review hearing for August 9, 2012.

Throughout the late winter and early spring of 2012, Father attended family therapy sessions with Son and Son's therapist, Briana Yoder ("the Therapist"). Prior to family therapy sessions, the Therapist met individually with Father. She warned him not to discuss Son's placement. Tr. p. 243. She also reminded Father that his emotional responses were a trigger for Son's adverse behavior. Tr. p. 243. She told him that during therapy Father should try to listen to Son, and that they should work to understand each other. Tr. pp. 239-240. The Therapist testified that even after these meetings, Father spent significant time in family therapy focused on his own issues, and then lectured Son about his poor behavior. Father often paced and yelled during these lectures.

Son continued to struggle with his behavior. His foster parent called the police to the home on at least one occasion. His foster parent expressed concern for other children in the home during Son's outbursts. She requested that Son be placed elsewhere, but agreed to keep him until other arrangements could be made. During phone conversations

---

[3] We note that the Permanency Progress Report was, at best, sloppy. While Father was criticized for attending only five out of twenty Batterer's Intervention Program Group meetings, Father's therapist, Shelly Hoefle, testified that he was asked to attend ten meetings. Tr. p. 297. In addition Permanency Progress Report recommend *both* reunification and termination of parental rights. Appellant's App. pp. 114-15.

and during family therapy sessions, Father lectured Son on his behavior. More than once, Father told Son that he might be institutionalized if he did not get his behavior under control. Tr. p. 242. At least once, Father told Son that he might not be able to live with Father because Father was concerned that Son was a threat to Father's safety. Tr. p. 243. Therapist testified that during the March 30 family therapy,

> "[Father], again, told [Son] that he's going to sign papers to have him put away. [Father] said he received court papers- he told [Son] he'd received court papers to take away his rights and then [Son]'s not ever going to see his dad again, is that what you want. And he was not sitting down talking about it, he was yelling at him. He told [Son] he really needed to turn this around if reunification was going to happen. [Father] also told [Son] that the upcoming court hearing was going to be focused completely on [Son]'s lack of cooperation and nothing about [Father]."

Tr. p. 244. On March 28, 2012, ECDCS filed for involuntary termination of the parent-child relationship.

On April 20, 2012, Father and Son participated in their final, explosive family therapy session. As usual, Father met with the Therapist alone ahead of time. She gave him an update. The Therapist said that Father seemed very angry. Father told the Therapist he wanted to give Son his Easter basket and say goodbye to Son. Tr. p. 246. This was not planned ahead of time.

Meanwhile, Son did not want to attend the session, telling Therapist that he was afraid he was in trouble. After Therapist reassured him that he was not in trouble, the session began. Within a couple of minutes Father began yelling. He told Son that they had been "over and over this" and Son wasn't doing what he was supposed to do, and Father was "done." Tr. p. 247. During this time, Father was pacing and yelling. He gave Son the Easter basket and the poster that they had been working on during therapy. He

9

asked Son for a hug. Son got up, and Father gave him a "half-hug." Then, Father left the room; slamming the door behind him. Tr. p. 248. Later, people on the other side of the building reported that they had heard the door slam. During the outburst, Son was quiet, sullen, withdrawn, and trembling. He moved his chair closer to Therapist, and he was sitting almost in a fetal position. Therapist further testified,

> "[O]n April 20, in all the years that I have done this work, that was the most explosive and traumatic and inappropriate type of behavior I have ever seen. And this child was re-traumatized in front of my eyes. And now I have this child, who's telling me repeatedly over and over, I'm not safe to go home because my dad is going to hurt me again and he's getting ready for his dad and he's scared. I would-I would not recommend that we have visitation and family therapy. That clinically, and ethically, that would be extremely inappropriate and it could completely retraumatize him again."

Tr. p. 266.

On May 1, 2012, ECDCS filed a motion to modify the dispositional decree, recommending a suspension of family therapy. Also on May 1, 2012, ECDCS submitted a Modification Report recommending the suspension of family therapy. Father and counsel appeared at the May 3, 2012 modification hearing. The court ordered that family therapy be temporarily suspended, and set the modification hearing for May 7, 2012.

Son met with Dr. Jeff Burnett ("Burnett") for a psychological evaluation on April 12, April 25, and May 1, 2012. The evaluation indicated that Son continued to have "blow ups," but he had also started hitting his siblings and peers during outbursts. Appellant's App. p. 134. Burnett did not agree with Son's RAD diagnosis, but did believe that Son continued to struggle with ADHD and PTSD. Burnett's report noted that, "[Son's] aggression appears to consistently go beyond the ability of a variety of medications [to] control." Appellant's App. p. 141.

10

Father attended the May 7, 2012 modification hearing with counsel. During the hearing, Father focused on himself and not the interests of Son. The court stated that Father's angry, defensive behavior was undermining Son's progress. Father did not attend Son's Individual Education Plan ("IEP") conference at his school, and Father told the CASA that he refused to attend a second IEP meeting as well. The court ordered family therapy and visitation suspended, and appointed the CASA as Son's educational surrogate. The court found that contact between Son and Father was detrimental to Son's well being. A Review Hearing was set for August 9, 2012.

On July 24, 2012, ECDCS submitted a progress report to the court. The report indicated that Father had only paid $20 in child support in the sixteen month pendency of the case. The report noted that Son was really struggling. He was having emotional and physical outbursts frequently. Son's foster mother requested that Son be removed from her care, but Family Case Manager was not able to find a placement at the time of the report. Appellant's App. p. 151. Father attended the August 9, 2012 periodic review hearing with counsel. The court found that while Father was compliant with his case plan, he had not enhanced his ability to fulfill his parental obligations.

An evidentiary hearing was held on August 24, 2013. Father appeared with counsel. At the time of the evidentiary hearing, Son had just turned thirteen years old. Several professionals who had attempted to assist Father testified at this hearing. The Family Case Manger testified that she could not recommend returning Son to Father because he did not comply with court orders or follow through with service provider

11

recommendations.[4]  For example, she asserted that Father did not regularly attend AA meetings and did not provide proof of completion of his GED.  Tr. p. 325.  The Family Case Manager believed termination of parental rights was in the best interest of Son because Son needed permanency.

The CASA testified that he could never recommend placing Son back with Father. He believed it was in Son's best interest to terminate the parent-child relationship because returning Son to Father would cause risk to Son.  Tr. p. 354.  Son had also repeatedly told the CASA that he was ready for a different family setting.  The Therapist testified that Son needed permanency and nurturing, consistent, responsible parents who can separate their adult issues from Son's issues.  Tr. p. 254.

On August 31, 2012 the court issued an order terminating Father's parental rights. Father now appeals.

## Discussion and Decision

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied.  Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment.  Id. Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.  In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

---

[4] It should also be noted that there were multiple contradictions in different reports submitted by ECDCS to the court regarding the permanency plan for Son.  In addition, at the Review Hearing on August 9, 2012, a mere fifteen days before the evidentiary hearing, Family Case Manager testified that Father was in compliance.  Tr. p. 191.  Father also did not complete a psycho-parenting assessment, however, that was partially due to Family Case Manager's lack of referral.

12

Where, as here, the juvenile court enters findings of fact and conclusions of law in its termination of parental rights, our standard of review is two-tiered. In re J.H., 911 N.E.2d 69, 73 (Ind. Ct. App. 2009), trans. denied. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. In re C.G., 954 N.E.2d 910, 923 (Ind. 2011). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. C.G., 954 N.E.2d at 923.

The Fourteenth Amendment to the United States Constitution protects the traditional rights of parents to establish a home and raise their children. Id. However, a juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a request to terminate parental rights. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. Id.

A request to terminate a parent's rights is not made lightly, and before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

13

        (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

        (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;

    (C)    that termination is in the best interests of the child; and

    (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2). If the trial court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

**I.**      **Whether Continuation of the Parent-Child Relationship Poses a Threat**

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. See L.S., 717 N.E.2d at 209. Because we find it to be dispositive, we limit our review to Father's allegations of error pertaining to subsection (b)(2)(B)(ii) of Indiana's termination statute, namely, whether ECDCS presented clear and convincing evidence establishing that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

We must first consider Father's assertion that continuation of the parent-child relationship does not pose a threat to Son. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and

14

social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287 (Ind. Ct. App. 2002).

Father argues that the trial court's conclusion that he was a threat to Son's well-being is not supported by the evidence. We disagree. It is true that Father maintained a home and a job. It is true that Father somewhat complied with services. It is true that that the trial court concluded that there is "no evidence to conclude that [Father] is wholly inadequate as a parent." Appellant's App. pp. 15-16. We also agree with several of the service providers and the trial court that Father loves Son very much, in his own way.

However, it is also true that after two years of services, Father could still not contain his own emotions in the presence of Son or adequately differentiate between appropriate and inappropriate topics of conversation. Importantly the Family Case Manager, CASA, and Therapist all agreed that Father's explosive behavior triggered Son's explosive behavior. This did not change throughout the case. Father's last explosive outburst on April 20, 2012 was a full twenty-six months after his explosive outburst that initially caused Son to be removed from his care. Father was repeatedly warned and advised not to discuss Son's placement or other adult topics with Son. However, Father continued to do so, even after a clear correlation was made between these inappropriate conversations and Son's emotional outbursts. Tr. p. 80. Not a single provider could recommend reunification, because Father was a trigger to Son's destructive and dangerous outbursts. Father's behavior was especially harmful to a child like Son who is constantly struggling with so many other, very serious, mental health issues. Father was explicitly and repeatedly told that his angry, threatening interactions

exacerbated Son's PTSD. In over two years, Father never proved that he could control himself in this respect around Son.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct, to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. After reviewing the record, we conclude that ECDCS presented clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. Father's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. See D.D., 804 N.E.2d at 265.

**II. Whether Termination is in Son's Best Interests**

Father also argues that ECDCS failed to show that termination of the parent-child relationship is in Son's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by ECDCS and to consider the totality of the evidence. In re J.S., 906 N.E.2d 226, 236 (Ind. Ct. App. 2009). We have previously held that the recommendations of the case manager and CASA to terminate parental rights, in addition to evidence that the continuation of the parent-child relationship poses a threat to the child, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

The trial court found that both the Family Case Manager and the CASA testified that termination of parental rights was in the best interests of Son. Appellant's App. p. 16. The CASA testified that he could never recommend placing Son back with Father. When asked what the CASA considered when making his opinion, the CASA testified,

> "The alternative is to give more time. It's been almost two and a half year and who knows how many more years it would take. [Son] needs stability. He needs a family. He wants to be adopted. He's told me that repeatedly. He's told other people the same and I think that's what we should do."

Tr. p. 354.

Family Case Manager testified that terminating Father's parental rights was in Son's best interests because,

> "[Son] needs permanency. He has been waiting for permanency for quite awhile. It's the opinions of the doctors and the therapists that termination is in his best interest. And just [Father]'s lack of progress. We've been doing this for over two years. Father has made some progress but I just don't feel as though it's satisfactory and, also, [Son] – I spoke with [Son] on Monday and he said that he does want to be adopted."

Tr. p. 339. Accordingly, the trial court's conclusion that termination of Father's parental rights is in Son's best interests is not clearly erroneous. Id.

### III. Satisfactory Plan

Finally, Father contends that the trial court erred when it concluded that ECDCS has a satisfactory plan for the care and treatment of Son. In order for the trial court to terminate the parent-child relationship the trial court must find that there is a satisfactory plan for the care and treatment of the child. In re B.D.J., 728 N.E.2d 195, 204 (Ind. Ct. App. 2000). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id.

17

Here Father argues that Son's need for stability is not assured if Father's rights are terminated. Son's foster mother is not planning to adopt him and has asked ECDCS to find another placement for Son. However, foster mother has also asserted that she will keep Son as long as she can. In addition, a plan for the care and treatment of the children is satisfactory even if there is not a specific family in place to adopt the children. Id. Attempting to find suitable parents to adopt Son is a satisfactory plan. See Lang v. Starke County OFC, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007). For all of these reasons, the trial court's determination on this issue is not clearly erroneous.

**Conclusion**

ECDCS presented clear and convincing evidence to support the juvenile court's findings and ultimate determination that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of Son; that termination of the parent-child relationship is in Son's best interests, and that ECDCS's search for an adoptive family is a satisfactory plan for Son's placement after Father's parental rights have been terminated.

Affirmed.

MAY, J., concurs.
BAKER, J., concurs with separate opinion.

18

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION )
OF PARENT-CHILD RELATIONSHIP OF )
R.E. (Minor Child), )
)
    and, )
)
D.E. (Father), )
) No. 20A05-1209-JT-469
    Appellant-Respondent, )
)
       vs. )
)
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Magistrate
Cause No. 20C01-1203-JT-8

**BAKER, Judge, concurring.**

I reluctantly concur and write separately only to explain my misgivings about the outcome of this case. In my view, this is a case where a father was desperately trying to do everything he could to reunite with his son, but the son's mental conditions were such that Father's efforts—consistent though imperfect at least through the filing of the termination petition—got him nowhere. A child has a right to both child support and parenting time that neither parent can contract away, even when both parents are in agreement. Perkinson v. Perkinson, No. 36S05-1206-DR-371, slip op. at 1 (Ind. June 25,

2013). However, there are also cases such as this one where the parent-child relationship may be permanently severed despite a parent's attempted involvement, so long as it is the government that requests it.

By all accounts, Father actively participated in the services ordered by the CHINS court until the DCS filed a petition to terminate his rights. And as pointed out by the majority, the CHINS court found that Father was in compliance with the case plan at every hearing up until the evidentiary hearing on the termination petition, with the last finding made a mere three weeks before the evidentiary hearing. In other words, Father complied with the case plan for more than two years only to have his supervised visitation revoked when Son's behavior deteriorated, then reinstituted through family therapy and additional services, then revoked again when Father showed his frustration during an exasperated goodbye to his son on April 20, 2012, which occurred within a few weeks after the DCS filed the termination petition. In my view, although Father was not a perfect parent, the record demonstrated that Father was committed to doing what was necessary to reunify with Son.

Nevertheless, under our standard of review, I am compelled to agree with the majority that despite all of Father's efforts over a period of more than two years, there is evidence in the record to support the finding that the continuation of the parent-child relationship posed a threat to Son. Simply put, there was evidence that Father was unable to control his emotions around Son, which further exacerbated Son's fragile mental state. So although I am loath to do so in this case, I reluctantly concur.